*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DAVID BROWN, Personal Representative of the
ESTATE OF DAWSON BROWN, JERRY M.
SOVA, JR., Personal Representative of the ESTATE
OF KOLE ALFRED PHILIP SOVA, AMY S.
SATTERTHWAITE and WILLIAM R. MAYS, SR.,
Co-Personal Representatives of the ESTATE OF
WILLIAM RICHIE MAYS, JR., KURTIS B. STITT,
and RAYFIELD JOHNSON II,

       Plaintiffs-Appellants,

v

LIVE NATION WORLDWIDE, INC.,

       Defendant/Cross-Defendant/Cross-
       Plaintiff-Appellee,

and

MICHIGAN INTERNATIONAL SPEEDWAY,
LLC,

       Defendant/Cross-Plaintiff/Cross-
       Defendant-Appellee.

UNPUBLISHED
September 27, 2024
8:49 AM

No. 365321
Lenawee Circuit Court
LC No. 2022-226896-NO

Before: MALDONADO, P.J., and PATEL and N. P. HOOD, JJ.

PER CURIAM.

This premises-liability action arises out of the tragic deaths of three young men, and the serious injuries to two others, as a result of carbon monoxide emitted from a portable generator set up in front of the camper-trailer they were staying in at the Faster Horses music festival held at the Michigan International Speedway, LLC (MIS). On appeal, plaintiffs challenge the trial court's

-1-

grant of summary disposition in favor of Live Nation Worldwide, Inc. under MCR 2.116(C)(10) and denying their motion for reconsideration. We affirm.

## I. BACKGROUND

In July 2021, Live Nation operated the Faster Horses music festival at MIS. As part of the festival, a temporary campground was set up on MIS's property. Michigan campground regulations require that all permanent and regularly available campsites be at least 1,200 square feet, but MIS obtained a variance from the Department of Environment, Great Lakes, and Energy (EGLE) allowing them to maintain campsites as small as 800 square feet, as long as certain conditions were met. Those conditions included that no campsites would be less than 800 square feet and that "24-hour security patrols and medical dispatch will be in place when the campgrounds opens [sic]."

Plaintiffs[1] attended the music festival and stayed together in a camper-trailer on one of the campsites. The camper was owned by Mays's grandfather, Roger Watson. On July 15, 2021, Watson and Mays set up the camper, which was powered by a portable generator. The generator was placed in the front left corner of the camper. On July 16, plaintiffs slept in the camper. The following morning, plaintiffs were discovered unresponsive in the camper. Johnson and Stitt were transported to a local hospital for treatment, but Brown, Mays, and Sova did not survive their injuries. Sheriff's deputies measured a high level of carbon monoxide inside the camper during their investigation. The deputies determined that the generator's rear exhaust was vented under the trailer, leading to the noxious fumes permeating inside the camper. The deputies discovered a carbon monoxide alarm in the trailer, but the batteries inside of the alarm were wrapped in plastic and the alarm did not appear to be functional. An autopsy confirmed that the decedents died from carbon monoxide poisoning.

Plaintiffs filed a complaint asserting negligence and premises claims against defendants. Plaintiffs alleged that defendants negligently caused their injuries by making the campsites too small to safely use generators and not properly monitoring and supervising the campground concerning the use of generators. Plaintiffs asserted that defendants "negligent/grossly negligent and careless operation/maintenance of the campground . . . proximately caused or contributed to [plaintiffs'] damages and injuries." Defendants each filed cross claims alleging indemnification, and notices of nonparty at fault asserting that Watson was at fault for setting up the generator in the location that caused plaintiffs' injuries. MIS also named Mays as a nonparty at fault, alleging that Mays participated in setting up the generator and should have discovered or known that carbon monoxide was accumulating in the camper.

---

[1] We refer to Dawson Brown, Kole Sova, William Mays, Jr., Kurtis Stitt, and Rayfield Johnson II as "plaintiffs." The claims stemming from the injuries to Brown, Sova, and Mays are brought by the personal representatives of their estates, who are the plaintiffs in this case along with Stitt and Johnson.

Prior to the close of discovery, Live Nation moved for summary disposition under MCR 2.116(C)(10). Live Nation argued that it did not owe plaintiffs a duty to protect or warn because it did not create the hazard or bring it on the land. Live Nation maintained that Mays and Watson created the alleged hazard on the premises when they improperly set up the generator, and that the hazard was open and obvious. MIS filed a response in support of Live Nation's motion for summary disposition.

Plaintiffs argued that summary disposition was premature, but even at the early stage in discovery there were factual issues. Plaintiffs asserted there were questions of material fact regarding the duties owed by defendants because there was a dispute whether Live Nation, MIS, or both had possession and control of the campground. Plaintiffs maintained that Live Nation "created an environment of misuse in light of reducing the size of the campsites to increase profit." Plaintiffs stated that defendants owed a common-law duty, a statutory duty, and a contractual duty. Plaintiffs contended there were questions of fact whether defendants breached their duties owed to plaintiffs because there was evidence that defendants failed to comply with the contractual duties they assumed in obtaining the variance. Plaintiffs further argued that there were jury questions regarding the open and obvious nature of the hazard—"in this case is the smaller campsites"—and their comparative fault. Plaintiffs asserted that "[t]he average person is not familiar with the distance required for free standing generators outside a closed camper[,]" and "no sufficient warning [or] instructions for placement and spacing of the generator was provided by [Live Nation]." Plaintiffs' relied on their electrical engineering expert, Kenneth Kutchek, who opined that defendants "created an unsafe condition . . . by allowing the use of gasoline powered portable generators in a congested high density campsite area." Kutchek maintained that "[t]he reduced size of the campsites . . . increased the density of the campsite area, eliminating any natural wind/air ventilation[,]" which "increased the carbon monoxide hazard in the campground." Kutchek stated that "[o]ther temporary portable electric power distribution systems were available and could have been utilized to eliminate the carbon monoxide hazard created by portable gasoline powered generators." Plaintiffs also relied on their facilities engineering expert, Christopher Fogarty, who offered opinions regarding the engineering design of the campsites, crowd management, and monitoring for carbon monoxide hazards.

The circuit court granted Live Nation's motion for summary disposition. The court reasoned that no hazardous condition existed on the campsite until one of the plaintiffs created the dangerous condition, i.e., brought a generator onto the property and arranged it so that it vented under the camper. The court also rejected plaintiffs' argument that Live Nation violated administrative rules, concluding that there was "no evidence that there were more sites in the campground than authorized by the license." Plaintiffs moved for reconsideration, which the trial court denied. The parties stipulated to the dismissal of plaintiffs' claims against MIS without prejudice, and Live Nation and MIS's cross claims without prejudice. This appeal followed.

## II. STANDARDS OF REVIEW

"We review de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). Summary disposition under MCR 2.116(C)(10) is warranted when "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10). When reviewing a motion for summary

disposition under MCR 2.116(C)(10), we must consider the evidence submitted by the parties in the light most favorable to the non-moving party. *El-Khalil*, 504 Mich at 160. "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id*. (cleaned up). Summary disposition under MCR 2.116(C)(10) is proper when, after considering all evidence in the light most favorable to the non-moving party, the court determines there is no genuine issue of material fact. *Id*. We are "not permitted to assess credibility, or to determine facts" in analyzing whether a genuine issue of material fact exists. *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994). "Instead, the court's task is to review the record evidence, and all reasonable inferences therefrom, and decide whether a genuine issue of any material fact exists to warrant a trial." *Id*. "If the opposing party fails to present documentary evidence establishing the existence of a material factual dispute, the motion is properly granted." *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 7; 890 NW2d 344 (2016) (citations omitted), quoting *Quinto v Cross and Peters Co*, 451 Mich 359, 362-363; 547 NW2d 314 (1996).

"We review a trial court's decision on a motion for reconsideration for an abuse of discretion." *Woods v SLB Prop Mgt, LLC*, 277 Mich App 622, 629; 750 NW2d 228 (2008). An abuse of discretion occurs when the trial court chooses an outcome that is outside the range of reasonable and principled outcomes. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006).

## III. ANALYSIS

Plaintiffs argue that there is a question of fact regarding Live Nation's duty and thus the trial court erred by prematurely granting Live Nation's motion for summary disposition and denying plaintiffs' motion for reconsideration. We disagree.

## A. PREMISES LIABILITY

As a preliminary matter, we clarify that despite plaintiffs' contention that this is a hybrid negligence/premises-liability claim, plaintiffs' claim clearly sounds in premises-liability. "It is well settled that the gravamen of an action is determined by reading the complaint as a whole, and by looking beyond mere procedural labels to determine the exact nature of the claim." *Adams v Adams (On Reconsideration)*, 276 Mich App 704, 710–711; 742 NW2d 399 (2007). "Courts are not bound by the labels that parties attach to their claims because this would exalt form over substance[.]" *Brendel v Morris*, 345 Mich App 138, 149; 4 NW3d 776 (2023) (cleaned up). "Michigan law distinguishes between claims arising from ordinary negligence and claims premised on a condition of the land." *Buhalis v Trinity Continuing Care Serv*, 296 Mich App 685, 692; 822 NW2d 254 (2012), overruled in part on other grounds by *Kandil-Elsayed v F & E Oil, Inc*, 512 Mich 95; 1 NW3d 44 (2023). In a premises-liability case, "liability arises solely from the defendant's duty as an owner, possessor, or occupier of land." *Id*. "If the plaintiff's injury arose from an allegedly dangerous condition on the land, the action sounds in premises liability rather than ordinary negligence; this is true even when the plaintiff alleges that the premises possessor created the condition giving rise to the plaintiff's injury." *Id*. In this case, plaintiffs assert that their injuries arose from an allegedly dangerous condition on the land—the size of the campsites. Thus, the case must be analyzed under premises-liability law.

-4-

"All negligence actions, including those based on premises liability, require a plaintiff to prove four essential elements: duty, breach, causation, and harm." *Kandil-Elsayed*, 512 Mich at 110. Whether a defendant owed a plaintiff a duty is a question of law for the court to decide. *Id*. at 112. In premises-liability actions, the duty owed by a defendant depends on whether the plaintiff is classified as a trespasser, licensee, or invitee. *Id*. at 111. In this case, it is undisputed that plaintiffs were invitees.[2] "Land possessors share a special relationship with invitees that generates 'an affirmative duty to protect.' " *Id*., quoting *Williams v Cunningham Drug Stores,* Inc, 429 Mich 495, 499; 418 NW2d 381 (1988).[3] For purposes of this appeal, it is undisputed that Live Nation owed plaintiffs a duty "to exercise reasonable care to protect [them] from an unreasonable risk of harm caused by a dangerous condition of the land." *Kandil-Elsayed*, 512 Mich at 112, quoting *Bertrand v Alan Ford, Inc*, 449 Mich 606, 609; 537 NW2d 185 (1995). But invitors "are not insurers; that is, they are not charged with guaranteeing the safety of every person who comes onto their land." *Hoffner v Lanctoe*, 492 Mich 450, 459; 821 NW2d 88 (2012).

Plaintiffs maintain that Live Nation "created an environment for misuse [of the generator] in light of reducing the size of the campsites" and that Live Nation assumed the contractual duty to provide 24-hour security patrols when it obtained the variance and permit to reduce the size of each campsite. Plaintiffs contend Live Nation had a duty to monitor the campsites for hazardous conditions and, in particular, discover the risk posed by the improperly vented generator that was set up by Mays and Watson.

"Michigan law has recognized that a special relationship exists between owners and occupiers of land and their invitees . . . ." *Bailey v Schaaf*, 494 Mich 595, 604; 835 NW2d 413 (2013). Although the special relationship imposes a duty on the landowner or occupier to affirmatively act to prevent the invitee from being harmed by a condition on the land, the duty is conditioned upon control of the land. *Id*. "These special relationships are predicated on an imbalance of *control*, where one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself." *Id*. The relationship between plaintiffs and Live Nation was not one in which plaintiffs had given up any control over the means available to them to protect themselves on their individual campsite. Plaintiffs had a superior degree of possession and control of their campsite than Live Nation and thus a superior ability to discover any hazards on their reserved campsite, including the improperly vented generator that was set up by Mays and Watson.

---

[2] "An 'invitee' is a person who enters upon the land of another upon an invitation which carries with it an implied representation, assurance, or understanding that reasonable care has been used to prepare the premises, and make it safe for the invitee's reception." *Stitt v Holland Abundant Life Fellowship*, 462 Mich 591, 596-597; 614 NW2d 88 (2000) (cleaned up).

[3] Plaintiffs argue that there is a question of fact whether Live Nation or MIS had possession and control of the campground and thus whether the duty is shared. But plaintiffs stipulated to the dismissal of their claims against MIS. Live Nation and MIS also stipulated to the dismissal of their cross claims. Further, Live Nation concedes, for purposes of this appeal, that it had sufficient control of the campground for a premises-liability claim. Accordingly, it is not relevant to this appeal whether there are questions of fact regarding Live Nation's control of the campground.

Plaintiffs contend that "there are disputed facts bearing on who created the hazard" and argue plaintiffs "were campers who were provided no instruction of placement of their generator by [Live Nation] who had reduced the space to locate them." Plaintiffs pleaded, and plaintiffs' counsel confirmed at oral argument, that the alleged hazard was the reduced campsite size. It is undisputed that the festival campsites were smaller than the normal 1200 square-foot regulation size, EGLE granted MIS an 800-foot variance, EGLE issued a permit that allowed 1,272 campsites, and Live Nation and/or MIS, not plaintiffs, created the boundaries for the individual campsites. It is further undisputed that Mays and Watson set up the subject generator on plaintiffs' reserved campsite. It is also undisputed that Live Nation distributed literature to purchasers of campsites warning that the campsites were "very close together" and that "the quieter and more ventilated your generator is the better." The literature instructed that internal generators should be piped up to "reduc[e] noise and divert[] exhaust fumes above the [recreational vehicle] . . . ." The literature further stated, "For free-standing generators, a muffle box can reduce noise and direct exhaust away from fellow campers. All generators are the sole responsibility of their owners."

There is no evidence that the alleged hazardous condition—the smaller size of the individual campsites—prevented campers from setting up generators so that the exhaust fumes were diverted above recreational vehicles, campers, and tents and away from camping areas. Plaintiffs had a superior degree of possession and control of their campsite and thus a superior ability to discover and remedy conditions on their reserved campsite, including the improperly vented generator that was set up by Mays and Watson. Invitors are not absolute insurers of the safety of their invitees. *Hoffner*, 492 Mich at 459. "An owner of property cannot be held liable under premises liability law for a design of the property that permits an invitee or person in control of the property to create a hazardous condition where none existed before." *Jones v DiamlerChrysler Corp*, 488 Mich 1036; 793 NW2d 242 (2011). Plaintiffs were not injured by the smaller campsite size. They were injured by the carbon monoxide fumes emitted from the improperly vented generator that was set up by Mays and Watson. We conclude as a matter of law that Live Nation did not have a common-law duty to monitor plaintiffs' campsite and discover the risk posed by the generator set up by Mays and Watson.[4]

## B. REGULATORY VIOLATIONS

Plaintiffs further argue that there is a question of fact whether Live Nation violated Michigan campground regulations and thus breached its duty as an invitor. We disagree.

---

[4] We agree with plaintiffs that the open and obvious nature of a condition is relevant to whether a defendant breached a duty and, if so, whether a plaintiff was comparatively at fault, not whether a defendant owed a duty. *Kandil-Elsayed v F & E Oil, Inc*, 512 Mich 95, 104, 144; 1 NW3d 44 (2023).

Plaintiffs contend that Live Nation violated regulations promulgated by EGLE regarding size of campsites,[5] the number of campsites on a campground,[6] and the terms of receiving a variance from the regulations.[7] Violations of administrative rules and regulations may be used as evidence of negligence. *Estate of Goodwin by Goodwin v Northwest Mich Fair Ass'n*, 325 Mich App 129, 163; 923 NW2d 894 (2018). However, "relevance must be specifically established before evidence of a violation may be used as evidence of negligence." *Id*. at 164 (cleaned up).

Plaintiffs argue that there was evidence that some of the campsites were smaller than 800 square feet. The trial court properly concluded that none of the regulations identified by plaintiff prohibit campsites less than 800 square feet and there is no administrative rule proclaiming campsites less than 800 square feet to be dangerous. Violating a term of an agreement under which a variance is granted is not a violation of any regulation. Moreover, there is no evidence that plaintiffs' individual campsite was less than 800 square feet. Even assuming that plaintiffs produced substantively admissible evidence that other campsites on the campground may have been less than 800 square feet,[8] there is no evidence that this alleged violation of the variance contributed to—let alone proximately caused—plaintiffs' injuries. There is no evidence that the size of other campsites prevented Mays and Watson from setting up the generator on plaintiffs' 800-square foot campsite so that the exhaust fumes were diverted above the camper and away from camping areas, as Live Nation's policy recommended. Any evidence of an alleged violation of the variance's campsite-size restriction is not relevant and may not be used as evidence of negligence. See *Estate of Goodwin*, 325 Mich App at 164.

Plaintiffs further argue that the trial court impermissibly made a finding of fact that there were not more campsites in the campground than were permitted by the license issued by EGLE. Plaintiffs assert that there was a conflicting number of campsites on the permit application as opposed to the map of the campsites and thus there are questions of material fact regarding the actual number of campsites.[9] Any alleged dispute regarding the number of campsites is not

---

[5] Mich Admin Code, R 325.1556(1) provides, in general, that a campsite must be at least 1,200 square feet and provide space to park a vehicle and hold a recreational unit. MCL 333.12501(1)(f) defines "recreational unit" as "a tent or vehicular-type structure, primarily designed as temporary living quarters for recreational, camping, or travel use, which either has its own motive power or is mounted on or drawn by another vehicle which is self-powered."

[6] Mich Admin Code, R 325.1556(8) provides that "[a] campground owner shall ensure that the number of sites in a campground is not more than the number authorized by the license."

[7] Under Mich Admin Code, R 325.1586, EGLE "may grant a written variance if the department determines that strict compliance with these rules would cause unusual practical difficulties and hardships, that the variance would not affect the safe and healthful operation of the campground, and that the spirit and intent of the rules can be maintained."

[8] It is well established that a "reviewing court should evaluate a motion for summary disposition under MCR 2.116(C)(10) by considering the substantively admissible evidence." *Maiden v Rozwood,* 461 Mich 109, 121; 597 NW2d 817, 824 (1999).

[9] A sitemap of the campground stated that there were 1,252 campsites within the campground, but MIS's temporary campsite permit application to EGLE stated that there would be 1,272 campsites.

material because there is no evidence that the total number of campsites on the campground affected plaintiffs' 800-square foot campsite or prevented the generator from being set up on plaintiffs' campsite so that the exhaust fumes were diverted above the camper and away from camping areas, as Live Nation's policy recommended. Quite simply, any evidence that the actual number of campsites varied from the number authorized by the license is irrelevant and may not be used as evidence of negligence. See *id.*

Similarly, plaintiffs argue that Live Nation was in violation of EGLE's regulations regarding variances because the variance at issue required Live Nation to provide 24-hour security patrol of the campground. As stated above, violating a term of an agreement under which a variance is granted is not a violation of any regulation. Further, there is no evidence that Live Nation did not provide 24-hour security patrol of the campground. While plaintiffs contend that "security patrol" encompassed a duty to "monitor" the campsites for carbon monoxide hazards and "supervise" the setting up of portable generators, there is no evidence that the variance agreement required such monitoring and supervision. The plain terms of the agreement simply state "24-hour security patrols[,]" as proposed by MIS when it requested the variance. The variance does not say anything about monitoring the campsites for carbon monoxide hazards or supervising the set up of portable generators on individual campsites, and it cannot be reasonably inferred that 24-hour security patrol requirement was intended to prevent carbon monoxide injuries. Moreover, there is no regulatory duty to inspect campsites for safety. Accordingly, any evidence of an alleged violation of the variance's 24-hour security patrol requirement is not relevant and may not be used as evidence of negligence. See *id.*

## C. CONTRACTUAL DUTY

Plaintiffs argue that Live Nation had a contractual duty regarding campsite sizing, monitoring, and supervision based on its contract with MIS and thus Live Nation had a duty to prevent plaintiffs' injuries. We disagree.

Plaintiffs contend that the contract placed possession and control of the campground with Live Nation. As discussed, the relationship between Live Nation and MIS regarding possession and control of the campground is not material to this appeal.

Plaintiffs also argue that Live Nation accepted a contractual duty to properly set up and monitor the campground and thus had a duty to reasonably perform its contractual duties. Because this is an action in tort, plaintiffs cannot rely on the contract between Live Nation and MIS to establish a duty that Live Nation owed to plaintiffs that did not already exist under common-law premises liability. A duty of care may arise "between a party to a contract and a noncontracting third party." *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011). But the "mere existence of a contractual promise does not ordinarily provide a basis for a duty of care to a third party in tort[.]" *Id.* at 170. The threshold question is " 'whether the defendant owed a duty to the plaintiff that is separate and distinct from the defendant's contractual obligations.' " *Id.* at 166, quoting *Fultz v Union-Commerce Assoc*, 470 Mich 460, 469-70; 683 NW2d 587 (2004). Thus, it must be shown that "*aside from the contract*, the defendant owed [an] independent legal duty to the plaintiff." *Loweke*, 489 Mich at 172 (emphasis added). "[A] separate and distinct duty to support a cause of action in tort can arise by statute, or by a number of preexisting tort principles, including duties imposed because of a special relationship between the

parties, and the generally recognized common-law duty to use due care in undertakings . . . ." *Id.* at 170 (cleaned up).

As discussed, Live Nation did not have a common-law or statutory duty to monitor plaintiffs' campsite and discover the risk posed by the generator set up by Mays and Watson. Although Live Nation had a duty to avoid harm when acting, see *id.* at 170, there is no general tort "duty that obligates one person to aid or protect another," *id.* at 164 (cleaned up). The contract between Live Nation and MIS does not support plaintiffs' negligence claim founded on Live Nation's alleged breach of its contractual duties. See *id.* at 172.

### D. SUMMARY DISPOSITION BEFORE THE CLOSE OF DISCOVERY

Plaintiffs argue that the trial court erred by prematurely granting summary disposition in Live Nation's favor before the close of discovery. We disagree.

When a motion for summary disposition is filed before the close of discovery, the operative question is whether summary disposition is premature because further discovery stands a fair chance of uncovering factual support for the nonmovant's position. *Marilyn Froling Revocable Living Trust v Bloomfield Hills Country Club*, 283 Mich App 264, 292; 769 NW2d 234 (2009). "[T]he mere fact that the discovery period remains open does not automatically mean that the trial court's decision to grant summary disposition was untimely or otherwise inappropriate." *Id.* Instead, the nonmovant must identify the disputed issues and support that further discovery stands a fair chance of uncovering additional factual support through independent evidence. *Id.*, citing MCR 2.116(H)(1) "The party opposing summary disposition must offer the required MCR 2.116(H) affidavits, with the probable testimony to support its contentions." *Marilyn Froling Revocable Living Trust*, 283 Mich App at 292-293. See also *Mich Nat'l Bank v Metro Institutional Food Serv, Inc*, 198 Mich App 236, 241; 497 NW2d 225 (1993) ("[A] party opposing a motion for summary disposition because discovery is not complete must provide some independent evidence that a factual dispute exists."). Mere speculation that additional discovery may uncover supporting evidence is not enough. *Caron v Cranbrook Ed Community*, 298 Mich App 629, 646; 828 NW2d 99 (2012).

Plaintiffs argue that further discovery was necessary to establish what duty Live Nation owed to plaintiffs. First, plaintiffs contend that further discovery was needed to determine whether Live Nation or MIS had possession and control of the campground. But, for the purposes of summary disposition, Live Nation conceded that it had possession and control of the campground. Plaintiffs also argue that further discovery is needed to determine whether Live Nation decreased the size of campsites from 1,200 square feet to 800 square feet to increase profits. Live Nation's motivation is not relevant to the question of duty. Plaintiff further contend that further discovery was needed, including Live Nation's financial records, to determine the exact number of campsites sold in 2021. Absent evidence that the number of campsites, or the size of other campsites, prevented the generator from being set up on plaintiffs' campsite so that the exhaust fumes were diverted above the camper and away from camping areas, as Live Nation's policy recommended, there were no facts that could have been discovered that would change the duty analysis in this case.

## E. DENIAL OF MOTION FOR RECONSIDERATION

Finally, plaintiffs argue that the trial court erred when it denied their motion for reconsideration. We disagree.

MCR 2.119(F)(3) provides:

Generally, and without restricting the discretion of the court, a motion for rehearing or reconsideration which merely presents the same issues ruled on by the court, either expressly or by reasonable implication, will not be granted. The moving party must demonstrate a palpable error by which the court and the parties have been misled and show that a different disposition of the motion must result from correction of the error.

After oral argument on Live Nation's motion for summary disposition, but before the trial court entered its opinion and order granting the motion, the parties deposed Jennifer Hutchinson, a MIS employee. Plaintiffs argued in their motion for reconsideration that Hutchinson's testimony showed that there were questions of material fact regarding Live Nation's duties to plaintiffs regarding the size of campsites and 24-hour security patrol. Plaintiffs also asserted that Hutchinson's testimony showed that Live Nation inadequately responded to plaintiffs' injuries because there was no post-incident discussion regarding the use of generators or the size of campsites.

As discussed, plaintiffs cannot establish Live Nation had a duty regarding plaintiffs' use of the generator. Hutchinson's testimony does not change those considerations. Hutchinson's testimony regarding defendants' responses to plaintiffs' injuries is also not relevant to any questions concerning Live Nation's duties and any alleged breaches. Under MRE 407, when a defendant takes remedial measures after an accident to improve the safety of the condition, those remedial measures are generally inadmissible to prove that the defendant negligently caused the plaintiff's injury. Plaintiffs have not demonstrated that they attempted to offer Hutchinson's deposition testimony for a purpose other than impermissibly attempting to show that Live Nation's negligence cause plaintiffs' injuries. Hutchinson's testimony did not establish any palpable error by which the trial court had been misled or that a different disposition on Live Nation's motion for summary disposition should result. Accordingly, the trial court did not abuse its discretion by denying plaintiffs' motion for reconsideration.

## IV. CONCLUSION

Although the trial court granted summary disposition in favor of Live Nation on different grounds, we affirm because the right result was reached, i.e., granting summary disposition to Live Nation. See *Pro-Staffers, Inc v Premier Mfg Support Servs*, 252 Mich App 318, 322; 651 NW2d 811 (2002).

Affirmed.


/s/ Sima G. Patel
/s/ Noah P. Hood